## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**LOUIS JOHN WOLVERTON**

*Plaintiff,*

CIVIL ACTION NO. 3:20-CV-1963

**vs.**

JUDGE CHRISTOPHER C. CONNER

**MIA GRAY**
**PADGETT-PATTERSON**

*Defendant.*

### PLAINTIFF'S MEMORANDUM OF LAW
### IN SUPPORT OF HIS REQUEST TO ENTER
### DEFAULT JUDGMENT PURSUANT TO FED.R.CIV.P 55(b)

Plaintiff, Louis John Wolverton ("Plaintiff"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of his Request pursuant to Fed.R.Civ.P. 55(b)(2) for entry of default judgment against Defendant Mia Gray Padgett-Patterson ("Defendant"), and further requests this Court set a date for an evidentiary hearing to determine the amount of damages to be awarded. In support therefor, Plaintiff avers as follows:

### I.    INTRODUCTION

Louis John Wolverton is a 22-year-old who was employed as a lifeguard at Shawnee Village Wyndham Resorts. See Complaint at ¶8, ECF 1. At around 6:30 PM on July 18, 2020, at the Wyndham's Shawnee Village pool, lifeguard Jonathan

1

Shanley ("Shanley") began his thirty minute rotation in the lifeguard chair. See Complaint at ¶9, ECF 1. During Shanley's rotation, he noticed an African American family who had a child with them, aged about six to eight years old. See Complaint at ¶9, ECF 13. Shanley observed the child did not swim very well and was clinging to the wall at the deep end, where there the sign indicated it was six feet deep. See Complaint at ¶9, ECF 14.

Shanley was immediately aware this child could not stand on the bottom of the pool. See Complaint at ¶9, ECF 15. In accordance with protocol, and in such situations, Shanley politely asked the parents to take the child into the shallow end. See Complaint at ¶9, ECF 16. The shallow end is separated from the deep end by a rope which floats on the water. See Complaint at ¶9, ECF 18. As Shanley approached, he asked two other children and their parents to move over to the shallow end for the same reasons previously described. See Complaint at ¶9, ECF 19. They did so without a problem. See Complaint at ¶9, ECF 20.

Shanley then approached the family and requested them to kindly take their child over to the shallow end since the child seemed to have "a bit of trouble swimming." See Complaint at ¶9, ECF 21. The parents questioned him and were clearly unhappy, but they moved from the six feet depth to about four-and-a-half feet depth. See Complaint at ¶9, ECF 22.

This was not the shallow end. See Complaint at ¶9, ECF 23. The shallow end is clearly marked as three-and-a-half feet at its maximum depth and is marked on the other side with the floating rope. See Complaint at ¶9, ECF 23. Shanley decided that he would watch the child and would only intervene if there was a dangerous situation. See Complaint at ¶9, ECF 24.

The family, however, stared at Shanley for a very long period of time which Shanley found threatening and caused him to be hesitant to say anything further. See Complaint at ¶9, ECF 25. After this, Shanley respectfully requested five or six more children and their parents to leave the deep end, which they did without incident. See Complaint at ¶9, ECF 26. Notably, the previous year, a child required CPR because he had difficulty in the deep end. See Complaint at ¶9, ECF 27. It was Plaintiff who revived that child in the previous year. See Complaint at ¶9, ECF 28. As a consequence of this incident, the lifeguards imposed a strict policy about moving children out of the deep end if they did not appear to be solid swimmers. See Complaint at ¶9, ECF 29.

After asking about six children and their parents to move to the shallow end, Shanley continued to watch the child in four-and-a-half feet of water. See Complaint at ¶9, ECF 30. Meanwhile, this family still stared at Shanley, in a hostile manner. See Complaint at ¶9, ECF 31. One of the family members smiled in Shanley's direction and it became clear that he was the subject of their

conversation. See Complaint at ¶9, ECF 32. Shanley then saw the child had become distressed and no members of the family had noticed. See Complaint at ¶9, ECF 33. As Shanley prepared to enter the water, the child reached out and held on to the shoulders of an adult, who had his back to him. See Complaint at ¶9, ECF 34.

Although relieved, Shanley went around to the family for a second time and repeated that he noticed that the child was still having trouble swimming and he wanted him to go to the shallow end. See Complaint at ¶9, ECF 35. This time, Shanley emphasized "on the other side of the rope." See Complaint at ¶9, ECF 36. The family members then questioned Shanley in a hostile manner about why he had needed to ask them a second time. See Complaint at ¶9, ECF 37. Shanley responded that he just noticed the child was having trouble swimming and probably needed a bit more practice and that should be done where it was safer, which was on the other side of the rope. See Complaint at ¶9, ECF 38.

While Shanley was explaining this, the family tried to cut him off in midsentence. See Complaint at ¶9, ECF 39. One male member of the family said "but you already told us this and we're watching him. Listen, let me explain something to you, we may not look educated to you, but I assure you, we know how to take care of our kid. What makes you think you can tell us what to do with our kid?" See Complaint at ¶9, ECF 40.

Shanley said that all he was trying to do was to keep their child safe. See Complaint at ¶9, ECF 41. The family told him to get out of their face and laughed. See Complaint at ¶9, ECF 42. One male member of the family stopped in front of Shanley and asked, "what's the story?" See Complaint at ¶9, ECF 43. Shanley replied by giving this member of the family an update. See Complaint at ¶9, ECF 44. This member of the family then defended Shanley to the family by saying, "he's just doing his job, relax." See Complaint at ¶9, ECF 45. This member of the family then turned to Shanley and told him he was a good man. See Complaint at ¶9, ECF 46.

At that point, Plaintiff arrived to rotate Shanley out of the lifeguard chair. See Complaint at ¶9, ECF 47. Shanley updated Plaintiff on the child he had been watching and advised Plaintiff to watch him also because his family had not moved him entirely out of the deep end. See Complaint at ¶9, ECF 48. Shanley further advised Plaintiff about some other swimmers he had noticed while on guard duty. See Complaint at ¶9, ECF 49.

Shanley started his desk duty at the front of the pool area at 7:00 PM. See Complaint at ¶9, ECF 50. The family continued to stare at him for the entire 37 minutes he was at the desk. See Complaint at ¶9, ECF 51. Another lifeguard, Sean Pickett ("Pickett"), relieved Shanley at 7:40 PM and asked if Plaintiff needed to be

rotated. See Complaint at ¶9, ECF 52. Plaintiff said he was fine since there was only twenty minutes left until the pool closed. See Complaint at ¶9, ECF 53.

Pickett, however, rotated Shanley to inside the lifeguard shed to get him out of sight of the family who had never stopped staring at him. See Complaint at ¶9, ECF 54. At 8:00 PM, Plaintiff blew his whistle to announce they were closing the pool. See Complaint at ¶9, ECF 55. Plaintiff went inside the lifeguard shed for a moment to check on Shanley since he had appeared to be a little shaken by the incident. See Complaint at ¶9, ECF 56. Plaintiff then exited the lifeguard shed and blew his whistle again and again announced they were closing and everyone should please leave the pool. See Complaint at ¶9, ECF 57.

A minute or two later, all of the family members started to yell at all of the lifeguards, but most pointedly at Plaintiff. See Complaint at ¶9, ECF 58. They insulted the character of all of the lifeguards and Plaintiff responded, in a calm manner, "I'm sorry, sir, I would just like to ask you to leave." See Complaint at ¶9, ECF 59. One man responded, "who the fuck are you to tell me to leave?!" See Complaint at ¶9, ECF 60. The lifeguards, in answer, referenced their lifeguard shirts and said, "the pool is closing and we're the lifeguards." See Complaint at ¶9, ECF 61.

One of the men, in his early twenties, pointed to Plaintiff and then to Shanley and said, "so that's Louis and this is Johnny Boy." See Complaint at ¶9,

ECF 62. He then kept repeating "Johnny boy, Johnny boy, Johnny boy" as if

committing it to memory. See Complaint at ¶9, ECF 63. Pickett was questioned

and asked in a hostile manner whether he was the one who told them to "get out of

the fucking pool." See Complaint at ¶9, ECF 64. Pickett responded he had not been

the one to close the pool or ask anyone to leave. See Complaint at ¶9, ECF 65.

Plaintiff was then asked, in a hostile manner if he was the one who said, "get

out of the fucking pool" and Plaintiff denied saying any such thing. See Complaint

at ¶9, ECF 66. Meanwhile, the women who were off to the left said, "it's not worth

it, let's go." See Complaint at ¶9, ECF 67. Shanley pointed to the man still saying,

"Johnny boy" and told him that he had done nothing to him and had had no issue

with him. See Complaint at ¶9, ECF 68. One of the family members then called the

lifeguards "a bunch of racists." See Complaint at ¶9, ECF 69.

Shanley said he was just trying to keep the child safe. See Complaint at ¶9,

ECF 70. The man who defended Shanley before then said, "these two men were

just doing their job, but Louis what makes you think you can tell us to leave?" See

Complaint at ¶9, ECF 71. It was clear they were confusing Shanley for Plaintiff.

See Complaint at ¶9, ECF 72. The man who had insulted Shanley and called him

uneducated then said, "listen, I just got done doing ten years and I don't mind

going back; I'll call my boys down to smoke all of you motherfuckers." See

Complaint at ¶9, ECF 73.

Shanley said, "we did nothing to you besides trying to keep your kid safe, and our job. I have to ask you to leave, sir." See Complaint at ¶9, ECF 74. At this point, the family began to leave and shortly thereafter, security walked in and the lifeguards updated them. See Complaint at ¶9, ECF 75. The lifeguards then closed the pool as usual for the night, locked up and headed upstairs to clock out and to brief the front desk on what had just happened. See Complaint at ¶9, ECF 76. The lifeguards requested that a security detail be posted at the pool for the next day. See Complaint at ¶9, ECF 77.

The following morning, Shanley opened the pool at 7:30 AM and he, once more, requested security at the pool gate. See Complaint at ¶9, ECF 78. The front desk promised to send someone down, but never did. See Complaint at ¶9, ECF 79. At 12:00 PM, Plaintiff climbed on to the lifeguard stand while Shanley went in to the lifeguard shed to give his manager a report of the previous day's events. See Complaint at ¶9, ECF 80.

While Plaintiff was on the lifeguard stand, two members of the African American family from the day before, went directly past the front desk, without any reservation, and walked right up to Plaintiff in the guard chair and started to take pictures of him and then a video. See Complaint at ¶9, ECF 81. During the video, they yelled, "this is the man who said he wants to kill all the black people." See Complaint at ¶9, ECF 82. Three hours later, Plaintiff's picture was posted

Defendant's Facebook page. See Complaint at ¶9, ECF 83. Defendant specifically stated in her post, "this did not happen to me personally. I don't sit back and wait until it happens to me, because it can and will. So, we have reservations for Shawnee Resorts next weekend. I have family there. This weekend and he said "I wish these BLACK PEOPLE WOULD GET THE "F" OUT THE POOL." See Complaint at ¶9, ECF 84. The posting specifically identified Plaintiff by name and posted his photograph. See Complaint at ¶9, ECF 85. Defendant's post, labeling the Plaintiff a racist, went viral. See Complaint at ¶9, ECF 86.

Plaintiff was, very shortly after Defendant's posting online, threatened, vilified, and insulted by numerous persons. See Complaint at ¶9, ECF 87. Plaintiff's full name and his photograph while on the lifeguard stand was reposted countless times with a banner across his enlarged photograph, in block a capitals, allegedly quoting him as saying, "I HOPE THESE BLACK PEOPLE GET THE FUCK OUT OF THE POOL." See Complaint at ¶9, ECF 88. Underneath the banner was Plaintiff's full name and the words "Life Guard." See Complaint at ¶9, ECF 89. The banner, Plaintiff's forgoing alleged quote and his color photograph were all part of Defendant's post. See Complaint at ¶9, ECF 90.

Even after Defendant's Facebook post was compulsorily removed by Facebook, Defendant protested online that the post should not have been removed. See Complaint at ¶9, ECF 91. Even with the post's removal by Facebook, the post

was nonetheless reposted countless times. See Complaint at ¶9, ECF 92. Plaintiff

became and remained the immediate subject of online conversations, where his

character was maligned, his life was threatened, and he was viciously insulted. See

Complaint at ¶9, ECF 93.

Plaintiff had to explain the entire circumstances in order to defend himself

from severe disciplinary action by the University which had accepted him as a

student. See Complaint at ¶9, ECF 94. Plaintiff never made the racial slur and/or

slurs Defendant accused him of. See Complaint at ¶9, ECF 95. The accusation that

he did make such a slur, or words like it, is completely untrue. See Complaint at

¶9, ECF 96. Plaintiff has never uttered a racial slur. See Complaint at ¶9, ECF 97.

## II.    LEGAL ARGUMENT

### a.  Standard of Review

If a default has been entered against a party who has failed to plead or

otherwise defend an action, and the party against whom default has been entered

does not seek to vacate the entry of default, the Court may then enter a default

judgment upon application of the plaintiff. *See* Fed. R. Civ. P. 55(a)-(b); *Comdyne*

*I, Inc. v. Corbin*, 908 F.2d 1142, 1150 (3d Cir. 1990). Once default has been

entered, "the factual allegations of the complaint, except those relating to the

amount of damages, will be taken as true." *Comdyne I, Inc. v. Corbin*, 908 F.2d

1142, 1150 (3d Cir. 1990) (quoting 10 C. Wright, A. Miller & M. Kane, *Federal*

*Practice and Procedure*, § 2688 at 444 (2d ed. 1983)). If the damages are not for "a sum certain or for a sum which by computation be made certain, the court may conduct such hearings or order such references as it deems necessary and proper." Fed.R.Civ.P. 55(b)(2).

### b.  Entry of Default Judgment is Appropriate Given Defendant's Failure to Respond

Defendant has failed to respond to the entry of default by this Court. Under such circumstances, there is no opportunity for the Court to examine whether Defendant has any meritorious defense to assert. Plaintiff would undoubtedly be prejudiced if the Court were to deny entry of default judgment because Plaintiff has no other means of vindicating his claims against Defendant. Accordingly, default judgement is appropriate in this matter. *Peterson v. Boyarsky Corp.*, 2009 WL 983123 (D.N.J. Apr. 8, 2009).

Compensatory damages recoverable for defamation include actual damages recoverable for the proven harm caused by the defamatory publication. *Walker v. Grand Cen. Sanitation, Inc.*, 634 A.2d 237, 244 (Pa. Super. 1993). Actual damages include general damages and special damages. *Sprague v. Am. Bar Ass'n*, 276 F.Supp.2d 365, 368 (E.D. Pa. 2003). Actual damages must be established through competent evidence concerning the injury. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 350. Where damage of reputation is claimed, evidence concerning the circulation and contents of the defamatory publication may support an inference that it was

11

read by it intended recipients and caused damage to the plaintiff's reputation.

*Agriss v. Roadway Exp., Inc.*, 483 A.2d 456, 463. Additionally, the plaintiff may

also present testimony concerning his loss of reputation. *Wilson v. Benjamin*, 481

A.2d 328, 333 (Pa. Super. 1984). General damages means actual harm, which

includes emotional distress, mental anguish, and personal humiliation as well

as damage to reputation. *Joseph v. Scranton Times, L.P.*, 89 A.3d 251, 269 (Pa.

Super. 2014).

A plaintiff in a defamation action may recover punitive damages if there is

clear and convincing evidence that the defendant published the defamatory

statements with actual malice. *Bargerstock v. Wash. Green Cmty. Action Corp.*,

580 A.2d 361, 415 (Pa. Super. 1990). Plaintiff is also entitled to attorneys' fees and

court costs. 27 Pa.C.S. § 7707.

A plaintiff in an invasion of privacy action may recover damages for the

harm to his interest in privacy resulting from the invasion, his mental distress

proved to have been suffered if it is of a kind that normally results from such an

invasion, and special damage of which the invasion is a legal cause. *Wecht v. PG*

*Pub. Co.*, 725 A.2d 788, 790 (Pa. Super. 1999) (citing Restatement (Second) of

Torts  § 625H).

Plaintiff is prepared to submit evidence to this Court regarding the damages

resulting from Defendant's defamatory actions, as well as emotional distress

suffered as a result of same. Additionally, Plaintiff is prepared to submit evidence to this Court regarding the damages for the harm to his interest in privacy resulting from Defendant's invasion, his mental distress suffered from such an invasion, and special damage of which the invasion is a legal cause. Further, Plaintiff is prepared to submit evidence with regard to his request for punitive damages and attorneys' fees and costs. An evidentiary hearing is necessary to determine the damages to which Plaintiff is entitled.

## III.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests this Court enter the attached Order for entry of default judgment against Defendant Mia Gray Padgett-Patterson and set a date on which this Court shall conduct a hearing to determine the amount of damages to be awarded to Plaintiff.

Respectfully Submitted,

KOLMAN LAW, P.C.

 /s/ Timothy M. Kolman
Timothy M. Kolman, Esquire
414 Hulmeville Ave
Penndel, PA 19047
(215) 750-3134
*Attorney for Plaintiff*

Dated: June 1, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**LOUIS JOHN WOLVERTON**

*Plaintiff,*

CIVIL ACTION NO. 3:20-CV-1963

**vs.**

JUDGE CHRISTOPHER C. CONNER

**MIA GRAY
PADGETT-PATTERSON**

*Defendant.*


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of Plaintiff's Memorandum of Law in Support of His Request Pursuant to Fed.R.Civ.P. 55(b)(2) for Entry of Default Judgment against Defendant Mia Gray Padgett-Patterson was served upon the following via First Class Mail:

**Mia Gray Padgett-Patterson
740 E. 78 Street, Apartment 8H
Bronx, NY 10457**

KOLMAN LAW P.C.

<u>/s/ Timothy M. Kolman</u>
Timothy M. Kolman, Esquire

Dated: June 1, 2021

14