## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LOUIS JOHN WOLVERTON,** | : | **CIVIL ACTION NO. 3:20-CV-1963** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MIA GRAY PADGETT-PATTERSON,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Plaintiff Louis John Wolverton commenced this action asserting claims for defamation and false-light invasion of privacy against defendant Mia Gray Padgett-Patterson.  Following entry of default against Padgett-Patterson, Wolverton moves the court for default judgment as to both claims and for an evidentiary hearing to assess the appropriate amount of damages.  For the reasons that follow, we will deny Wolverton's motion without prejudice.

### I.    Factual Background & Procedural History

Wolverton was employed as a lifeguard at Shawnee Village Windham Resorts during the summer of 2020.  (See Doc. 1 ¶¶ 8, 11, 47).  At approximately 6:30 p.m. on July 18, 2020, Wolverton's coworker, Jonathan Shanley, began a 30-minute rotation in the lifeguard chair.  (See id. ¶ 11).  Shanley observed an African American family in the deep end of the pool with a child, about six to eight years old, who was struggling to swim and clinging to the pool wall to stay afloat.  (See id. ¶¶ 13-15).  As a result of an incident the year prior in which a young child needed to be resuscitated, the lifeguards had instituted a policy of moving children out of the

deep end if they did not appear to be solid swimmers. (See id. ¶¶ 27-29). Pursuant to this policy, Shanley approached the family and politely asked them to move the child to the shallow end of the pool, which is only three and one-half feet deep and is separated from the deep end by a floating rope. (See id. ¶¶ 16-18, 21). Shanley asked two other families to move to the shallow end for the same reason, and both families complied without incident. (See id. ¶¶ 19-20).

The family with the struggling child "questioned [Stanley] and were clearly unhappy" but nonetheless moved to a shallower section of the pool, to a depth of roughly four and one-half feet. (See id. ¶ 22). Although the family had only partially complied with his request, Shanley decided to simply keep an eye on the child and intervene only if a dangerous situation arose. (See id. ¶¶ 23-24). According to the complaint, the family had begun to stare at Shanley in a "threatening" and "hostile" manner that made him hesitant to reiterate his request. (See id. ¶¶ 25, 31). Shanley thereafter instructed five or six more families to move their children to the shallow end, all of whom complied. (See id. ¶ 26).

Shanley observed that the child with the uncooperative family had become "distressed" and that his family members had not noticed. (See id. ¶ 33). Just as Shanley prepared to enter the water, the child reached out and pulled himself to safety using the shoulders of an adult family member who had their back to him. (See id. ¶ 34). Shanley instructed the family that because the child was still having trouble swimming, they must move to the shallow end. (See id. ¶ 35). The family members again became "hostile," questioning Shanley about why he was making them move and challenging his authority to tell them "how to take care of our kid."

(See id. ¶¶ 37-40).  The family members allegedly "told [Shanley] to get out of their face and laughed."  (See id. ¶ 42).  When another member of the family arrived and asked Shanley what was going on, Shanley provided an update, and that individual told his family to "relax" because Shanley was just doing his job.  (See id. ¶¶ 43-46).

At this time, Wolverton arrived to begin his rotation in the lifeguard chair. (See id. ¶ 47).  Shanley updated Wolverton about the child he had been watching and advised Wolverton to keep an eye on him since the family refused to move to the shallow end.  (See id. ¶ 48).  At 8:00 p.m., Wolverton blew his whistle to alert patrons the pool was closing for the evening.  (See id. ¶ 55).  A few minutes later, Wolverton blew his whistle again, reiterating that they were closing and ordering everyone to leave the pool.  (See id. ¶¶ 56-57).  The family whose child had been struggling to swim in the deep end became verbally combative, yelling at and insulting the lifeguards, with one family member asking "who the fuck are you to tell me to leave?!"  (See id. ¶¶ 58-60).  When Wolverton and Shanley replied they were lifeguards charged with closing the pool for the night, one of the men in the family started taunting them.  (See id. ¶¶ 61-63).

The situation began to escalate, with someone in the family asking Wolverton if he was the one who told them to "get out of the fucking pool."  (See id. ¶ 66).  Wolverton replied that he said no such thing.  (See id.)  The female members of the family tried to intercede, saying "it's not worth it, let's go," (see id. ¶ 67), while other family members continued the altercation, calling the lifeguards "a bunch of racists," (see id. ¶ 69).  Another male family member then said to Shanley, "listen, I just got done doing ten years and I don't mind going back; I'll call my boys down to

smoke all of you motherfuckers." (See id. ¶ 73). Shanley replied that the lifeguards did nothing but try to keep the child safe and reiterated that the family must leave. (See id. ¶ 74). The family then left the pool. (See id. ¶ 75). Security arrived shortly thereafter, and the lifeguards debriefed them on the situation. (See id. ¶¶ 75-76).

Wolverton worked another shift the following day and took his place in the lifeguard chair at 12:00 p.m. (See id. ¶ 80). Two members of the same family from the evening before "went directly past the front desk, without any reservation, and walked right up to [Wolverton] in the guard chair and started taking pictures of him and then a video." (See id. ¶ 81). In the video, the family members yelled that "this is the man who said he wants to kill all the black people." (See id. ¶ 82).

Three hours later, Padgett-Patterson posted Wolverton's photograph on her Facebook page. (See id. ¶ 83). The relationship between Padgett-Patterson and the family from the pool, if any, is unclear from the complaint. Padgett-Patterson wrote in her post as follows:

> [T]his did not happen to me personally. I don't sit back and wait until it happens to me, because it can and will. So, we have reservations for Shawnee Resorts next weekend. I have family there. This weekend and he said, " I wish these BLACK PEOPLE WOULD GET THE 'F' OUT THE POOL."

(Id. ¶ 84). The photograph that accompanied the post was edited to include a banner attributing to Wolverton the quote "I HOPE THESE BLACK PEOPLE GET THE FUCK OUT OF THE POOL." (See id. ¶¶ 88, 90). The post identified Wolverton by his full name and job title of "Life Guard. (See id. ¶¶ 85, 89).

4

Padgett-Patterson's post went viral and was shared "countless times." (<u>See</u> <u>id.</u> ¶¶ 86, 88). Shortly afterward, Wolverton began receiving online threats and was vilified and insulted by "numerous people." (<u>See</u> <u>id.</u> ¶ 87). Facebook took the post down at some point, (<u>see</u> <u>id.</u> ¶ 91), but the damage was done: the post continued to be shared across the platform, and Wolverton "remained the immediate subject of online conversations, where his character was maligned, his life was threatened, and he was viciously insulted." (<u>See</u> <u>id.</u> ¶ 93). Wolverton also alleges he had to explain the situation to the university that had accepted him as a student to avoid severe disciplinary action. (<u>See</u> <u>id.</u> ¶ 94). Wolverton avers he has never uttered a racial slur and expressly denies ever making the slur attributed to him by Padgett-Patterson's Facebook post. (<u>See</u> <u>id.</u> ¶¶ 95-97).

Wolverton commenced this action on September 14, 2020, with the filing of a two-count complaint in the United States District Court for the Eastern District of Pennsylvania. The Eastern District subsequently transferred the case to this court. On November 20, 2020, Wolverton's counsel filed a return of service indicating a process server had served the complaint on an individual named Debra Moore, identified in the return as "relative/co-tenant," on November 4, 2020, at Padgett-Patterson's residence in Bronx, New York. (<u>See</u> Doc. 6). Because the address listed for Padgett-Patterson in the return differed from the address in the complaint, we ordered Wolverton to explain the discrepancy. (<u>See</u> Doc. 7). Wolverton submitted a letter explaining a skip trace had revealed Padgett-Patterson no longer resided at the New Jersey address listed in the complaint and had moved to the Bronx, New York, address. (<u>See</u> Doc. 9). Wolverton also submitted documentation confirming

the results of the skip trace.  (<u>See</u> Docs. 9-1, 9-2).  We thereafter entered an order
finding Padgett-Patterson had been properly served in accordance with the Federal
Rules of Civil Procedure.  (<u>See</u> Doc. 10).

Padgett-Patterson never answered the complaint, and counsel did not
enter an appearance on her behalf.  At Wolverton's request, the Clerk of Court
entered default against Padgett-Patterson on February 17, 2021.  Wolverton then
filed the instant motion for default judgment and supporting brief on June 1, 2021.
In the more than eight months that have elapsed since Wolverton filed his motion,
Padgett-Patterson has not responded to the complaint or to the motion, nor has
counsel entered an appearance on her behalf.

## II.   <u>Discussion</u>

Federal Rule of Civil Procedure 55 governs default judgments.  <u>See</u> FED.
R. CIV. P. 55.  Once a default has been entered, <u>see</u> FED. R. CIV. P. 55(a), the non-
defaulting party may apply to the court for a default judgment, <u>see</u> FED. R. CIV.
P. 55(b)(2).  The court may take the facts in the operative pleading—except those
pertaining to damages—to be true for purposes of resolving the motion for default
judgment.  <u>See</u> <u>DIRECTV, Inc. v. Pepe</u>, 431 F.3d 162, 165 n.6 (3d Cir. 2005) (quoting
<u>Comdyne I, Inc. v. Corbin</u>, 908 F.2d 1142, 1149 (3d Cir. 1990)); 10A CHARLES ALAN
WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 2688.1 (4th ed. 2018)
(citing, *inter alia*, <u>Comdyne I, Inc.</u>, 908 F.2d 1142).  A district court considering a
motion for default judgment must consider three factors: "(1) prejudice to the
plaintiff if default is denied, (2) whether the defendant appears to have a litigable
defense, and (3) whether the defendant's delay is due to culpable conduct."

Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000).[1]  Whether to enter

default judgment is left to the discretion of the district court.  See id.

The first and third factors plainly favor Wolverton.  He commenced this

lawsuit 16 months ago.  It has been nearly a year since the Clerk of Court entered

default, and more than eight months since Wolverton moved for default judgment.

In that time, no attorney has entered an appearance on Padgett-Patterson's behalf,

nor has Padgett-Patterson herself responded to the complaint or to the motion.  We

find that Padgett-Patterson's failure to participate whatsoever in this lawsuit can

---

[1] In Chamberlain, the panel cited to United States v. $55,518.05 in U.S. Currency, 728 F.2d 192 (3d Cir. 1984), for the proposition that these "[t]hree factors "control whether a default judgment should be granted."  Chamberlain, 210 F.3d at 164 (citing $55,518.05 in U.S. Currency, 728 F.2d at 195).  That decision, however, and all other decisions cited therein were examining whether to *set aside* an entry of default or default judgment, not whether to *enter* default judgment.  $55,518.05 in U.S. Currency, 728 F.2d at 195 (motion to set aside entry of default and default judgment) (citing Gross v. Stereo Component Sys., Inc., 700 F.2d 120, 122 (3d Cir. 1983) (motion to set aside default judgment); Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656 (3d Cir. 1982) (same); Farnese v. Bagnasco, 687 F.2d 761, 764 (3d Cir. 1982) (motion to set aside entry of default)).  The Chamberlain decision does not explicitly acknowledge that it is extending the "set-aside" factors to a new and different context nor does it express a rationale therefor.  As one Third Circuit judge has observed, the actions of entering a default judgment and setting one aside are "clearly distinguishable," and the Chamberlain court "may have unwittingly imposed an unrealistic and misplaced burden on plaintiffs, and unduly constrained the discretion of district courts."  Hill v. Williamsport Police Dep't, 69 F. App'x 49, 52-53 (3d Cir. 2003) (Rendell, J., concurring) (nonprecedential).  We echo and fully agree with Judge Rendell's concerns.  Common sense dictates that the burden of proffering a meritorious defense should fall upon the shoulders of a defendant who seeks to set aside a default; we see no justification for transposing that burden to a plaintiff seeking an entry of default judgment against a defendant who has failed to appear.  Nonetheless, this court is bound by Chamberlain until and unless the Third Circuit revisits the decision *en banc*.  Id. at 52 (majority opinion) (observing that the district court "of course had no choice" but to follow Chamberlain); see, e.g., GEICO v. Pennsauken Spine & Rehab P.C., No. 17-11727, 2018 WL 3727369, at *4 n.1 (D.N.J. Aug. 6, 2018).

only be the result of culpable conduct, and that her conduct has prejudiced

Wolverton by delaying his opportunity to vindicate his claims.

It is the second factor that gives the court pause: whether Padgett-Patterson

appears to have a litigable defense—or, conversely, whether Wolverton has stated

viable claims.  Wolverton pleads two counts, both arising under Pennsylvania law:

a claim for defamation in Count I, and a claim for false-light invasion of privacy in

Count II.  Even accepting Wolverton's allegations as true, see DIRECTV, Inc., 431

F.3d at 165 n.6 (quoting Comdyne I, Inc., 908 F.2d at 1149), we cannot find, at this

juncture, that Wolverton has established viable causes of action.

To prevail on a defamation claim under Pennsylvania law, a plaintiff must

allege (1) the communication was defamatory in nature, (2) the communication

was published by the defendant, (3) the communication applied to the plaintiff,

(4) the recipient of the communication understood its defamatory meaning and its

application to the plaintiff, and (5) the plaintiff suffered special harm as a result

of the communication's publication.  See 42 PA. CONS. STAT. § 8343(a); Graboff

v. Colleran Firm, 744 F.3d 128, 135 (3d Cir. 2014).  A defamatory statement is one

that "tends so to harm the reputation of another as to lower him in the estimation

of the community or to deter third persons from associating or dealing with him."

Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir. 2001) (quoting Tucker v. Fischbein,

237 F.3d 275, 282 (3d Cir. 2001)).

Similarly, to state a claim for false-light invasion of privacy, a plaintiff

must show the defendant published material that "is not true, is highly offensive to

a reasonable person, and is publicized with knowledge or in reckless disregard of its

falsity." See Graboff, 744 F.3d at 136; Larsen v. Phila. Newspapers, Inc., 543 A.2d

1181, 1188 (Pa. Super. Ct. 1988) (*en banc*) (citing RESTATEMENT (SECOND) OF TORTS

§ 652E (AM. L. INST. 1977)).  Pennsylvania courts give a broad reading to the idea

of falsity.  See Graboff, 744 F.3d at 136.  Even if a statement is true in the literal

sense, it may be "susceptible to inferences" casting an individual in a false light and

thereby give rise to a false-light claim.  See Phila. Newspapers, 543 A.2d at 1189.

Nonetheless, a misrepresentation must be sufficiently injurious that "serious

offense may reasonably be expected to be taken by a reasonable man in his

position."  RESTATEMENT (SECOND) OF TORTS § 652E, cmt. c (AM. L. INST. 1977).

Wolverton alleges in his complaint that Padgett-Patterson's Facebook post

"accuse[d] [him] of racism" and "single[d] him out in public as a racist" and that the

captioned photograph "reflects that [he] is a racist."  (See Doc. 1 ¶¶ 103, 107).  The

trouble for Wolverton is that, under Pennsylvania law, a "simple accusation" that a

person is racist is not, by itself, defamatory.  See McCafferty v. Newsweek Media

Grp., Ltd., 955 F.3d 352, 358 (3d Cir. 2020) (quoting MacElree v. Phila. Newspapers,

Inc., 674 A.2d 1050, 1055 (Pa. 1996)).  Nor can an opinion that someone is racist

support a false-light claim.  See id. at 360.  Rather, the accusation must imply

something more, such as "that the accused has personally broken the law to 'act[]

in a racist manner.'"  See id. at 358 (discussing MacElree, 674 A.2d at 1054, where

accusations of racism against district attorney were plausibly actionable because

they implied he was abusing his office to further racism) (alteration in original).

Wolverton's supporting brief is silent as to this critical point.  (See Doc. 16

at 11).  Indeed, Wolverton's brief says nothing about the elements required to make

out his claims or what facts and legal theories he believes support them.  (See id.)

On the limited facts available to the court, it appears Padgett-Patterson may have at

least one viable defense—*viz.*, that her accusations categorically cannot subject her

to defamation or false-light viability under controlling law.  We are thus disinclined

to grant default judgment to Wolverton without further development of this issue.

**III.**   **Conclusion**

We will deny Wolverton's motion for default judgment without prejudice

to his right to refile same.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Date:      February 14, 2022